UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:  3/13/2015
```

---------------------------------------------------------------X

In re:                                              :
                                                    :
ADELPHIA COMMUNICATIONS CORP., et al., :          Chapter 11 Case,
a Delaware Corporation,                             :          Case No. 02-41729 (REG)
                                                    :
                                        Debtors.    :
---------------------------------------------------------------:
                                                    :
ADELPHIA RECOVERY TRUST,                            :          Civil Case No. 14-CV-5532
                                                    :                    (VEC)
                                        Plaintiff,  :
                                                    :          Appeal arising from Adv.
                  -against-                         :          Pro. No. 04-3295 (REG)
                                                    :
FPL GROUP, INC., et al.,                            :          MEMORANDUM
                                                    :          OPINION & ORDER
                                       Defendants.  :
---------------------------------------------------------------X

VALERIE CAPRONI, United States District Judge:

This case arises out of the chapter 11 reorganization of debtor Adelphia Communications

Corporation ("Adelphia") and 232 of its affiliates.  In this action, the Plaintiff, Adelphia

Recovery Trust ("Recovery Trust"), as the successor to Adelphia's rights, seeks to recover, as a

fraudulent transfer, approximately $150 million that Adelphia paid to FPL Group, Inc. ("FPL")

and FPL's affiliate Mayberry Investments Inc. ("Mayberry," and together with FPL, the

"Defendants") in January 1999 for the repurchase of Adelphia's own stock.

After a week-long trial, on May 6, 2014, Judge Gerber of the U.S. Bankruptcy Court for

the Southern District of New York issued Proposed Findings and Fact and Conclusions of Law

(the "Decision") in favor of Defendants, finding that, although Adelphia did not receive fair

value for the stock repurchase transaction, Recovery Trust failed to meet its burden of showing

that Adelphia was left insolvent, without adequate capital or rendered equitably insolvent at the

time of the stock repurchase.  Decision at 76-77 (Dkt. 1).  Pursuant to Federal Rule of

Bankruptcy Procedure 9033(b) and Local Bankruptcy Rule 9033-1, Recovery Trust timely

objected to the Bankruptcy Court's Decision.  Plaintiff's Objections to the Bankruptcy Court's

Proposed Findings of Fact and Conclusions of Law After Trial ("Pl.'s Obj.").  (Dkt. 2).  For the

reasons that follow, the Decision is AFFIRMED, and Recovery Trust's appeal is DISMISSED.

## I.     BACKGROUND

### A.  The Challenged Stock Repurchase Transaction

On January 28, 1999, Adelphia paid Mayberry $149,213,130 to repurchase its own

common stock and Class C convertible preferred stock, which had previously been purchased by

FPL's wholly-owned subsidiary Telesat Cablevision, Inc. ("Telesat") and assigned to Mayberry.

Decision at 6, 13.  Apart from stock certificates for the shares, Adelphia received no other

consideration for the transfer.  *Id.* at 14.  In a later transaction that closed on October 1, 1999,

Adelphia's affiliate Olympus Communications, L.P. ("Olympus") paid FPL $108 million to

redeem Telesat's interest in a joint venture partnership between Olympus and FPL.  *Id.* at 15.

The context for these transactions was that FPL, a company with roots in the electrical power

industry, wanted to exit the cable television business, which it had entered earlier in an effort to

diversify.  *Id.* at 3.  In particular, FPL was seeking to liquidate approximately 1 million shares of

Adelphia stock that it owned, either directly or indirectly, and to liquidate its partnership interest

in Olympus.  *Id.* at 6-7.

In certain respects, the stock repurchase transaction and the partnership redemption

appear to have been interdependent steps of a singular transaction designed to facilitate FPL's

exit from the cable television business.[1]  Other factors, however, suggest that the stock

---

[1]      For example, the terms of the transactions were summarized together in a one-page letter agreement, dated
January 21, 1999, between Adelphia and Telesat (the "Letter Agreement"), Decision at 7-8, and Adelphia's Board of
Directors adopted resolutions authorizing both transactions at the same Board meeting on January 27, 1999.  *Id.* at
11.  The next day, January 28, 1999, Adelphia issued a press release disclosing the substance of the Letter
Agreement and announcing the aggregate purchase price for the two transactions.  *Id.* at 13.

repurchase and partnership redemption were related but independent events, either of which could have occurred without the other.[2]  Ultimately, Judge Gerber concluded that, because the two transactions were not contingent or conditioned upon each other, and the stock repurchase was executed some eight months prior to the partnership redemption, at a time when the terms of the partnership redemption were in a nascent state, the two transactions were not interdependent components of a single transaction.  *Id.* at 16.  The stock repurchase was therefore viewed independently for purposes of Judge Gerber's fraudulent transfer analysis.  Because Judge Gerber found that Adelphia's repurchase of its own stock provided it with *no* value, and because no excess value that Adelphia may have received from the partnership redemption could be considered to offset this deficiency, Judge Gerber concluded that Adelphia's purchase of its stock was made without fair consideration.  *Id.* at 2.  On appeal, neither party disputes Judge Gerber's finding in this regard.

### B.  Adelphia's Solvency at the Time of the Stock Repurchase

Adelphia's financial condition at the time of the stock repurchase is the subject of a classic battle of the experts, each of whom applied different methodologies and assumptions to arrive at starkly different conclusions.  The largest discrepancy in the experts' conclusions as to solvency is attributable to the different methodologies they employed to determine Adelphia's total economic value ("TEV") at the time of the challenged transaction.  Recovery Trust's solvency expert, Israel Shaked ("Shaked"), employed the Discounted Cash Flow ("DCF")

---

[2]     The Letter Agreement contained no language suggesting that the stock repurchase transaction and the partnership redemption were conditioned upon one another; nor were the purchase prices for the two transactions contingent upon each other in any way.  Decision at 10.  FPL's SEC filings described the stock repurchase and the partnership redemption as separate transactions.  *Id.* at 15-16 (citing FPL Group Annual Report (Form 10-K) (Mar. 2, 1999)).  Perhaps most significant, while the stock repurchase transaction was executed the day after it was authorized by Adelphia's Board, the terms of the partnership redemption were left open to negotiation at that time (and ultimately subject to governmental approval), and the final redemption did not occur until October 1, 1999, more than eight months after the stock repurchase.  Decision at 8-10, 15.

methodology.  *Id.* at 18.  Although DCF is a standard valuation methodology for estimating a company's TEV, it relies heavily on cash flow projections, which both parties agreed were largely unavailable or unreliable here because any management or third-party projections made at the time would have been based on fraudulent, and therefore inaccurate, information.  *Id.* at 19.  For that reason, Shaked developed his own set of assumptions to create ten-year projections of Adelphia's cash flow and then extrapolated from those projections to estimate that Adelphia's unadjusted TEV at the time of the challenged transaction was $2.538 billion.  *Id.* at 19-20.

FPL's solvency expert, Ralph Tuliano ("Tuliano") relied instead on the Comparable Companies and Precedent Transactions methodologies, both of which measure the value of the subject company by determining the value of peer companies in its industry and then comparing the subject company to its peers.  *Id.* at 21-26.  Using the Comparable Companies method, Tuliano calculated the "value per subscriber" multiple for six peer companies in the cable industry (by dividing each company's TEV by its total number of subscribers) to generate a range of values.  *Id.* at 21-22.  Tuliano assigned Adelphia a multiple in the lower quartile of the applicable range, and then multiplied Adelphia's "value per subscriber" by its corrected number of subscribers[3] to estimate that Adelphia's unadjusted TEV was $5.004 billion.  *Id.* at 23-24 (citing Tuliano Decl. Ex. 1 at 2).  With regard to the Precedent Transactions methodology, Tuliano used the purchase price value of four other large cable companies that were acquired through mergers and acquisitions in the six-month period preceding the January 28, 1999 stock repurchase to calculate a range of "value per subscriber" multiples for those companies.  Decision at 25 (citing Tuliano Decl. ¶ 66).  Tuliano determined Adelphia's "value per

---

[3]      Although both Shaked and Tuliano relied on audit summaries created during the 2002 restatement process to estimate the correct number of subscribers, Tuliano concluded that Adelphia had 1,478,529 subscribers at the time of the stock repurchase, while Shaked found that Adelphia had 1,373,097 subscribers.  Decision at 47.  Judge Gerber accepted Tuliano's subscriber estimate over Shaked's, and Recovery Trust does not dispute this finding on appeal. *Id.* at 48.

subscriber" multiple based on the range he had calculated for its competitors, and then used that multiple to estimate that Adelphia's unadjusted TEV was $5.001 billion.  Decision at 26 (citing Tuliano Decl. Ex. 1 at 11).

Both experts made adjustments to their initial TEV estimates to account for the value of certain intercompany receivables as well as Adelphia's interests in its affiliate entities Verto Communications, Inc. ("Verto"), Adelphia Business Solutions, Inc. ("ABIZ") and Olympus. Decision at 26-31.  Taking these adjustments into account, Shaked concluded that Adelphia's adjusted TEV at the time of the stock repurchase was $2.845 billion, *id.* at 30 (citing Shaked Decl. at 34 ("Summary of Adelphia Equity Valuation")), while Tuliano found Adelphia's TEV to be $6.747 billion (after averaging the values he calculated using the Comparable Companies and Precedent Transactions methodologies).  Decision at 31 (citing Tuliano Decl. ¶¶ 71-72, Ex. 1 at 11).  After reducing Adelphia's TEV by its liabilities, which Shaked estimated to be approximately $3.722 billion and Tuliano estimated to be approximately $3 billion, Shaked concluded that, at the time of the challenged transaction, Adelphia was insolvent by approximately $1 billion, Decision at 17, 31 (citing Shaked Decl.¶ 111), whereas Tuliano found that Adelphia was solvent, with an equity cushion of approximately $3.7 billion.  Decision at 17, 32 (citing Tuliano Decl. at 26 tbl.2).

After reviewing the experts' calculations, Judge Gerber performed an independent analysis of Adelphia's TEV and liabilities at the time of the stock repurchase and reached conclusions that were much closer to Tuliano's than Shaked's.  In the end, Judge Gerber found Shaked's calculations, which were largely driven by his own assumptions, to be overly arbitrary and speculative, whereas Tuliano's calculations, which were grounded in a comparative analysis of "value per subscriber" metrics across competitor companies, were reliable, albeit overly optimistic.  Decision at 33.  After making his own line-by-line calculations, Judge Gerber

concluded that Adelphia was solvent with an equity cushion in the range of $2.494 to $2.497 billion at the time of the stock repurchase. *Id.* at 32, 44, App. A.  On appeal, neither party disputes Judge Gerber's conclusion that Adelphia had an equity cushion of approximately $2.5 billion at the time of the challenged transaction.

### C.  Adelphia's Capital Adequacy at the Time of the Stock Repurchase

Having found that Adelphia was solvent, Judge Gerber then analyzed whether Adelphia was adequately capitalized at the time of the stock repurchase.  Shaked, on behalf of Recovery Trust, opined that, at the time of the challenged transaction, Adelphia had an unreasonably small amount of capital and would have been unable to maintain business operations over a three-year period due to its negative cash flow and lack of access to new capital.  Decision at 45 (citing Shaked Decl. ¶¶ 54-60).  In support of this position, Recovery Trust offered evidence that, although Adelphia required substantial capital expenditures to stay afloat over the three years following the transaction: (1) Adelphia's reported debt-to-EBITDA ratio at the end of 1998 was 9.9x, putting it in breach of the debt covenants contained in its bond indentures, Flynn Decl. ¶ 20; Tr. 43:13–44:5; (2) Adelphia had fraudulently misstated its financial condition by approximately $400 million over the previous years, Savage Decl. ¶ 33; Tr. 850:15-24, 870:3-5, and Adelphia's subsidiaries had also produced false financial reports, putting them in default under their bank credit agreements and thereby restricting them from upstreaming dividends to Adelphia, DiBella Decl. ¶¶23-29; and (3) as of January 1999, Adelphia was cash flow negative, Shaked Decl. ¶¶54-55, 131, had no significant unencumbered assets against which to borrow, DiBella Decl. ¶¶18-19, 37, and had only $9.6 million in cash on hand.  DiBella Decl. ¶19.  In contrast, Tuliano opined that Adelphia had sufficient capital to maintain operations during the same three-year period, primarily due to its large equity cushion and continued access to capital markets.  Decision at 45 (citing Tuliano Decl. ¶¶ 100-101, 119-137).

### 1.   Adelphia's Cash Needs

Shaked, again employing the DCF methodology, estimated that Adelphia would require approximately $658 million to meet its capital needs from 1999 through 2001.  Decision at 45 (citing Shaked Rept. ¶ 132 and Ex. 4i).  Rather than making an independent assessment of Adelphia's capital needs, Tuliano adjusted several of Shaked's underlying assumptions to conclude that Adelphia would require only $531 million in capital over the three years following the stock repurchase.  Decision at 46 (citing Tuliano Decl. at 46 tbl.5).  Judge Gerber again conducted his own analysis to conclude that Adelphia would require approximately $600 million to meet its capital needs over the following three years.  Decision at 52, 59.  Neither party disputes this finding on appeal.

### 2.   Adelphia's Ability to Meet its Capital Needs

Before Judge Gerber, Recovery Trust argued that the combined effect of three factors— (1) debt covenants that limited Adelphia's ability to sell or grant liens on its assets; (2) Adelphia's high leverage ratio; and (3) the possibility that Adelphia's fraud would be revealed to investors—would have foreclosed Adelphia's access to the capital markets and prevented it from generating capital from asset sales, thereby leaving it with insufficient capital to survive.  Decision at 52-53.  Recovery Trust conceded, however, that none of these factors individually would necessarily have been sufficient to prevent Adelphia from raising capital and continuing in its business operations.  *Id.* at 53 (citing Shaked Decl. ¶¶ 78–79; Tr. 421:23-422:3, 456:22–457:10).

#### a.   Adelphia's Ability to Sell or Grant Liens on its Assets

Recovery Trust argued that Adelphia would have been unable to sell or grant liens on its assets in order to meet its capital needs because of its existing debt covenants.  Decision at 53, 55 (citing Pl.'s Pre-Trial Mem. at 2, 44; Tr. 239:5-9).  FPL disputed this contention, arguing that

Adelphia "had substantial flexibility to sell cable systems, if necessary, in order to deleverage."

Decision at 56 (citing Defs.' Post-Trial Mem. at 37-38).  In particular, Tuliano testified that,

under the terms of Adelphia's then-existing loan covenants, Adelphia could have sold, *inter alia*,

ABIZ, Verto, or any other of its "subscriber clusters" so long as it retained approximately

660,000 subscribers.  Defendants' Opposition to Recovery Trust's Objections to the Bankruptcy

Court's Proposed Findings of Fact and Conclusions of Law ("Defs.' Opp.") (Dkt. 3) at 22 (citing

Tr. 972:15-974:20, 977:12-999:5).  Judge Gerber agreed with FPL in this regard, concluding that

Adelphia could have sold assets "to provide sufficient capital if necessary."  Decision at 56.

### b.  Adelphia's High Leverage Ratio

Recovery Trust also argued that Adelphia's high leverage ratio put it in default under its

bond covenants, thereby restricting Adelphia's ability to obtain funding from existing

bondholders and further limiting its access to new sources of capital.  Decision at 52-53.  Under

Adelphia's debt agreements, Adelphia's maximum debt-to-EBITDA ratio was 8.75x; Adelphia's

publicly reported debt-to-EBITDA ratio at the end of 1998 was 9.9x, putting it in breach of those

debt covenants.  Decision at 54 (citing Shaked Rept.¶ 134 & n.9; Flynn Decl. ¶ 20; Tr. 43:13-

44:5).  Recovery Trust's expert, Robin Flynn ("Flynn"), also testified that, at that time, the

financial markets were not lending to cable companies with leverage ratios in excess of 7.0 to

8.0x EBITDA.  Flynn Decl. ¶ 23.

FPL argued that, at the time of the stock repurchase in late January 1999, Adelphia's

debt-to-EBITDA ratio was only 8.69x, lower than the leverage limits imposed by its debt

covenants, and that the ratio continued to fall in later years.  Tuliano Decl. at 47 tbl.6.  FPL

further argued that Adelphia would have been able to acquire new financing after the stock

repurchase even if its leverage ratio exceeded 8.75x EBITDA.  Tr. 423:17-23.  In support of that

position, FPL noted that Adelphia managed to finance three new acquisitions in 1999, when its

reported ratio was 9.9x, Defs.' Opp. at 9 (citing Tr. 41:12-44:5), and then raised billions of

dollars in financing from fiscal year 2001 onward, despite the fact that its publicly disclosed last-

quarter-annualized debt to EBITDA was above 8.75x.  Defs.' Opp. at 9 (citing Shaked Rept. ¶

58).  *See also* Shaked Rept. ¶¶ 55-57.  FPL also pointed to industry comparisons, noting that all

of Adelphia's telecommunications peers operated with negative cash flow during the relevant

period, yet none had difficulty obtaining financing.  Defs.' Opp. at 3.  FPL highlighted one peer

telecommunications company, Mediacom, that was able to raise $345 million in a successful IPO

in 1999 despite having a leverage ratio of 17x, *id.* at 9 (citing Tr. 59:13-24, 61:2-62:18.), and

$1.5 billion in debt financing in 2001, notwithstanding its 11.1x leverage ratio and incomplete

upgrade status.  Defs.' Opp. at 10 (citing Tr. 79:22-82:25).

        In his Decision, Judge Gerber agreed with FPL that Adelphia's high leverage ratio would

not, in isolation, or in combination with other factors, have caused Adelphia to lose access to

financing.

### c.  Knowledge of Adelphia's Fraud

        Finally, Recovery Trust argued that Adelphia's access to capital markets would have

been closed or severely limited once Adelphia disclosed that it had fraudulently overstated its

earnings by more than $400 million.  Pl.'s Post-Trial Mem. at 42.  In support of that position,

Shaked opined that if Adelphia's fraud had been exposed, its credit rating would have been

withdrawn and it would have violated existing debt covenants, making it difficult to obtain new

financing.  Shaked Decl. ¶¶ 57, 60.  Flynn opined that Adelphia's access to financing would have

been closed if the fraud had been disclosed.  Flynn Decl. ¶ 23.  Finally, Dennis Coyle, who was a

director of Adelphia and officer of FPL at the time of the transfer, and who testified as a fact

witness for FPL, suggested that if Adelphia's fraud had come to light in 1999, Adelphia would

have likely filed for bankruptcy at that time.  Pl.'s Obj. at 23-24 (citing Tr. 693:3-8).

In opposition, FPL's restructuring expert David Tabak ("Tabak") argued that, while it was "a theoretical possibility" that Adelphia would have lost access to the capital markets if the fraud had been disclosed, the empirical evidence shows that, under similar circumstances, companies were typically able to continue to raise capital after the disclosure of a fraud.  Defs.' Opp. at 11 (citing Tr. 768:5-23).  In particular, Tabak presented data from a study of nineteen companies that obtained access to the capital markets after disclosing a fraud.  Defs.' Opp. at 12-13 (citing Tr. 806:5-809:12).  *See also* Tabak Decl. ¶ 35.  Tabak also highlighted five major companies (Cendant, Waste Management, Rite Aid, Enron and WorldCom) that continued to secure financing from the capital markets after disclosing significantly larger frauds than Adelphia's fraud as of January 1999.  Defs.' Opp. at 13 (citing Tabak Decl. ¶¶ 45-63).  As a result, Tabak concluded that if Adelphia's fraud had been revealed in 1999, Adelphia would not have lost access to the capital markets, although its borrowing costs would have increased by approximately 1%.  Decision at 56-57 (citing Tabak Decl. ¶ 35).

Recovery Trust attacked Tabak's comparative analysis by arguing that two of the highlighted companies, Cendant and Waste Management, were much less leveraged than Adelphia and therefore were poor comparators.  Decision at 57 (citing Shaked Rebuttal Rept. ¶¶ 119–123).  Although Rite-Aide was able to raise post-fraud financing even though it had a leverage ratio much higher that Adelphia's, Decision at 57 (citing Tr. 812:8-813:16, 815:14-17), Rite-Aide's financing was secured by its liquid inventory, which Adelphia did not have.  Pl.'s Obj. at 20.  Recovery Trust further noted that Enron and WorldCom entered bankruptcy less than two years after the relevant financing was obtained.  *Id.* at 20-21 (citing Tr. 799:17-800:18).  Apart from attacking the validity of Tabak's comparative analysis, Recovery Trust offered no evidence, empirical or otherwise, demonstrating that Adelphia would have been foreclosed from accessing the capital markets because of its fraud.

Ultimately, Judge Gerber concluded that Recovery Trust had failed to satisfy its burden to establish that Adelphia would have lost access to the capital markets if its fraud had been disclosed in 1999. Decision at 57-60. In combination with his finding that Adelphia was able to sell assets and otherwise obtain new financing despite its high leverage ratio, Judge Gerber was "unpersuaded" by Recovery Trust's contentions that "the confluence of three factors— Adelphia's leverage ratio, its encumbered assets, and fraud—would cause the capital markets to be closed off to Adelphia." Decision at 60. Judge Gerber therefore found that Adelphia's stock repurchase was not a fraudulent transfer because, at the time of the transaction, Adelphia was neither insolvent nor left with inadequate capital. *Id.* at 61-62. Judge Gerber further noted that although Recovery Trust never argued equitable insolvency, there was no basis to conclude that Adelphia was equitably insolvent at the time of the stock repurchase. *Id.* at 61.

## II.    STANDARD OF REVIEW

Plaintiff seeks relief pursuant to 28 U.S.C. § 157(c), which permits the bankruptcy judge to issue findings of fact and conclusions of law in non-core proceedings, and Bankruptcy Rule 9033, which states that the district court may "accept, reject, or modify the [bankruptcy court's] proposed findings of fact or conclusions of law, receive further evidence, or recommit the matter to the bankruptcy judge with instructions." Because this is a non-core proceeding, both findings of fact and conclusions of law must be reviewed de novo. *See* Decision at 1 n.1, 77; *Adelphia Recovery Trust v. FLP Grp., Inc.,* No. 11 CIV. 6847 (PAC), 2012 WL 264180, at *5 (S.D.N.Y. Jan. 30, 2012) (finding this matter to be a non-core proceeding). *See also In re Prudential Lines, Inc.,* 170 B.R. 222, 228 (S.D.N.Y. 1994) ("In non-core related proceedings, the district court reviews *de novo* both the factual findings and the legal conclusions of the bankruptcy court.").

III.     DISCUSSION

A.  Applicable Law

The challenged transaction is governed by the Uniform Fraudulent Transfer Act, as

adopted by Pennsylvania ("PUFTA"), which creates liability for a constructive fraudulent

transfer where property is transferred for less than fair consideration and the debtor was insolvent

*or* "was engaged or was about to engage in a business or a transaction for which the remaining

assets of the debtor were unreasonably small in relation to the business or transaction . . . ."  12

Pa. Cons. Stat. Ann. § 5104 (2014).  *See also* Decision at 63 n.225; Pl.'s Obj. at 5-6; Defs.' Opp.

at 5.  The constructive fraud provisions of PUFTA and the Bankruptcy Code, at 11 U.S.C. §

548,[4] are analogous and therefore have been treated consistently by courts.  *See, e.g., Carroll v.*

*Stettler*, 941 F. Supp. 2d 572, 582 n.16 (E.D. Pa. 2013) (citations omitted); *In re C.F. Foods,*

*L.P.,* 280 B.R. 103, 115 (Bankr. E.D. Pa. 2002).

The Plaintiff bears the burden of proof in establishing that Adelphia lacked adequate

capital at the time of the stock repurchase.  Although Recovery Trust suggests that the burden

should have shifted to the Defendants after Recovery Trust provided evidence of inadequate

capitalization, *see* Pl.'s Obj. at 12, the case law is clear that there is no burden shifting under

PUFTA.  The burden of proof remains solely with Recovery Trust.  *See Fidelity Bond & Mortg.*

*Co. v. Brand*, 371 B.R. 708, 720-22 (E.D. Pa. 2007) (while burden-shifting was employed under

a prior statute, "PUFTA's legislative history and the stated goal of consistency with the

Bankruptcy Code lead to the conclusion that the burden of proof in constructive fraud cases

---

[4]       Section 548(a) of the Bankruptcy Code provides that a transfer may be avoided as a fraudulent transfer if
the debtor received less than a reasonably equivalent value in exchange and, at the time of the transfer, the debtor
"was engaged in business or a transaction, or was about to engage in business or a transaction, for which any
property remaining with the debtor was an unreasonably small capital."  11 U.S.C. 548(a)(1)(B)(i).

under PUFTA remains with the party challenging the transfer.").  The relevant inquiry, therefore, is whether Recovery Trust satisfied its burden of proving that the challenged stock repurchase left Adelphia with inadequate capital.

Although "unreasonably small capital" is not defined under PUFTA, the Third Circuit has held that "unreasonably small capital denotes a financial condition short of equitable insolvency" marked by "the inability to generate sufficient profits to sustain operations." *Moody v. Sec. Pac. Bus. Credit*, 971 F.2d 1056, 1070 (3d Cir. 1992) (interpreting identical language from PUFTA's predecessor statute).  Put differently, the question is whether the transfer left "the transferor technically solvent but doomed to fail." *MFS/Sun Life Trust–High Yield Series v. Van Dusen Airport Servs. Co.,* 910 F.Supp. 913, 944 (S.D.N.Y. 2005).

"[T]he test for unreasonably small capital is reasonable foreseeability." *Moody,* 971 F.2d at 1073.  To that end, courts will examine a variety of factors, including the company's "debt to equity ratio, its historical capital cushion, and the need for working capital in the specific industry at issue." *MFS/Sun Life Trust-High Yield Series*, 910 F. Supp. at 944.  When reliable financial records are available, courts test the reasonableness of any proffered financial projections by considering the company's actual "cash flow, net sales, gross profit margins, and net profits and losses," while also taking into account "difficulties that are likely to arise, including interest rate fluctuations and general economic downturns, and otherwise incorporate some margin for error." *Moody,* 971 F.2d at 1073 (citation omitted).  Courts also evaluate "all reasonably anticipated sources of operating funds, which may include new equity infusions, cash from operations, or cash from secured or unsecured loans over the relevant time period." *Id.* at 1072 n.24.  *See also id.* at 1073 (noting "it was proper for the district court to consider availability of credit").  The Committee Notes to PUFTA add that:

> Among other matters, appropriate weight should be given to the likelihood that maturing debts will be refinanced where, on the basis of the debtor's financial condition and future prospects and *the general availability of credit to debtors similarly situated*, it is reasonable to assume that such refinancing may be accomplished; *appropriate weight should be given to the debtor's ability to pay debts by disposing of fixed assets or other transactions outside the ordinary course of business*; and appropriate allowance should be made for reasonably foreseeable contingent obligations as they become absolute.

12 Pa. Cons. Stat. Ann. § 5104, Committee Comment 4 (emphasis added).  As suggested in the Committee Notes, courts consider asset sales and other transactions outside the ordinary course of business and compare the subject company to peer companies in its industry.  *See Fid. Bond & Mortg. Co.,* 371 B.R. at 728 ("Courts evaluating the unreasonably small assets test compare the company to others in the industry.") (citation omitted).

Because the "unreasonably small assets" test is grounded in foreseeability, the reasonableness of the company's actions with respect to the challenged transaction must be evaluated with respect to whether they were prudent when undertaken.  *See Fid. Bond & Mortg. Co.*, 371 B.R. at 723 (citing *MFS/Sun Life Trust–High Yield,* 910 F.Supp. at 944).  While a court may not use the benefit of hindsight to override the company's judgment as to what was otherwise reasonably foreseeable at the time, a court may carefully consider the events that transpired following the challenged transaction in evaluating what was reasonably foreseeable at that time.  *See Fid. Bond & Mortg. Co.,* 371 B.R. at 728 (in determining "unreasonably small capital," courts should consider "the length of time a company continued to operate and pay creditors after the disputed transfer") (citation omitted)).  *See also Moody,* 971 F.2d at 1074 (finding that the company's "actual performance after the acquisition supports the district court's finding that the parties' projections were reasonable.").

### B.  Adelphia Was Not Left with "Unreasonably Small Capital" at the Time of the Stock Repurchase Transaction

It is undisputed that Adelphia was having financial difficulties during the time period in question.  That is not enough, however, to satisfy Plaintiff's burden to show that, at the time of the stock repurchase in January 1999, Adelphia had "unreasonably small capital" to continue to function in its business for the foreseeable future.  Defendants' experts convincingly demonstrated that, in light of Adelphia's approximately $2.5 billion equity cushion and its ability to sell assets so long as it maintained 660,000 subscribers, Adelphia's capital needs of approximately $600 million were well within its reach.  Defendants' experts also presented specific evidence, including significant empirical evidence, demonstrating that despite its high leverage ratio and the possible revelation of a $400 million fraud, Adelphia likely would have maintained access to the capital markets to meet its financing needs and to continue in operation.  Because Recovery Trust failed to offer any reliable evidence to the contrary, and because Plaintiff's efforts to distinguish or dispute FPL's evidence were insufficient in light of its burden of proof, Judge Gerber was correct in recommending that Plaintiff's Complaint be dismissed and that judgment be entered in favor of the Defendants.

### 1.  Adelphia's Ability to Sell Assets

Recovery Trust challenges Judge Gerber's conclusion that Adelphia could have sold assets to obtain capital.  First, Recovery Trust argues that the most Adelphia could have recovered from the sale of its subsidiaries Verto and ABIZ was $135 million,[5] an amount significantly less than the $600 million that Adelphia needed over the following three years.

---

[5]     The Court notes that the Recovery Trust also disputes that the full $135 million purchase price paid for Verto should be the proper measure of its potential resale value, given Judge Gerber's acknowledgment that a litigation discount should apply.  Pl.'s Obj. at 17.  In light of the Court's finding, as discussed further *infra*, that Adelphia was able to sell *any* of its subscriber assets so long as it maintained 660,000 subscribers, it need not consider the exact value to be ascribed to ABIZ or Verto.

Pl.'s Obj. at 16-17.  Second, and more fundamentally, Recovery Trust argues that "the conclusion that capital adequacy can be proven through the ability to sell off assets is contrary to the law."  *Id.* at 17.  Both challenges are without merit.

As to the first argument, Recovery Trust misconstrues the record in suggesting that Judge Gerber's holding was limited to potential sales of ABIZ and Verto.  In fact, FPL argued, and Judge Gerber accepted FPL's argument, that Adelphia was able to sell *any* of its vast subscriber assets so long as it maintained 666,000 subscribers.  Decision at 56.  In discussing the significance of Adelphia's multi-billion dollar "equity cushion" at trial, Tuliano testified that: "Adelphia could have monetized that equity cushion in a number of ways through asset sales . . . .  It had the Verto that we've talked about.  It had its ABIZ stock, 645 million on a controlling basis.  It had the ability to effectively de-leverage the company with respect to this equity cushion."  Tr. 973:13-18.  *See also* Tr. at 974:13-15 (noting, without any reference to Verto or ABIZ, that "Adelphia could sell assets and effectively de-leverage should it choose to do so.").  In its Post-Trial Brief, FPL argued that "[Adelphia] could have sold ABIZ (a deleveraging move [it] proposed in 2001) or Verto, *and other subscriber clusters* so long as [Adelphia] retained approximately 660,000 subscribers, as required by the terms of its loan covenants."  Defs.' Post-Trial Mem. at 38 (citing Tr. 972:15-974:20, 977:12-999:5) (emphasis added).  Indeed, even Recovery Trust's expert conceded that Adelphia could have reduced its leverage by selling subscriber assets.  Tr. 51:2-5, 52:18-24, 107:9-14.  It was not surprising, therefore, that Judge Gerber ultimately found that Adelphia "had substantial flexibility to sell cable systems, if necessary, in order to deleverage," including, but not limited to, sales of ABIZ and Verto, so long as it retained at least 660,000 subscribers.  Decision at 56 (citing Defs.' Post-Trial Mem. at 37–38).

Adelphia could have raised a significant amount of capital without substantially compromising its subscriber base or breaching its loan covenants. Judge Gerber found that, at year-end 1998, Adelphia had 1,478,529 subscribers, Decision at 47-48 (citing Tuliano Decl. ¶ 90), a finding that Recovery Trust does not dispute on appeal. In his Comparable Companies analysis, Tuliano found "value per subscriber" multiples ranging from $2,462 to $3,835, Tuliano Decl. at 19 fig.2, and in his Precedent Transactions analysis, he found multiples ranging from $3,234 to $3,667. Tuliano Decl. at 25 fig.4. Even if the Court were to accept that Adelphia fell at the very bottom of each of these ranges, thereby meriting an average "value per subscriber" multiple of only $2,848, Adelphia would still have been able to raise $600 million by selling 210,674 subscribers, or roughly 14% of its subscriber base. Thus, the Court need not further address Recovery Trust's contention that Adelphia's sales of ABIZ and Verto alone would not have generated sufficient capital to meet its needs. Moreover, while Defendants did not address when, how and which assets could have been sold, it was Recovery Trust's burden to show that Adelphia could *not* have met its capital needs through asset sales, rather than Defendants' burden to show that Adelphia could have met its capital needs through particular asset sales.

Recovery Trust's related contention that Adelphia's ability to sell assets should not be considered at all in the Court's analysis is similarly misguided, albeit for legal, rather than factual reasons. Courts regularly consider the possibility of asset sales in evaluating a company's financial condition for purposes of the "unreasonably small assets" test. *See In re Jackson*, 459 F.3d 117, 123 (1st Cir. 2006) (in applying UFTA, courts should examine "the ability of the debtor to generate enough cash from operations *and sales of assets* to pay its debts and remain financially stable" after a transfer) (emphasis added) (quotation and citations omitted); *Vadnais Lumber Supply, Inc. v. Byrne* (*In re Vadnais Lumber Supply, Inc.*), 100 B.R. 127, 137 (Bankr. D. Mass. 1989) (under the "unreasonably small capital" provision in 11 U.S.C.

17

§ 548, courts must assess "the ability of the debtor to generate enough cash from operations or asset sales to pay its debts and still sustain itself" after a transfer).  *See also* 12 Pa. Cons. Stat. Ann. § 5104, Committee Comment 4.

Recovery Trust places undue reliance on *ASARCO LLC v. Ams. Mining Corp.*, 396 B.R. 278 (S.D. Tex. 2008), and *Tronox Inc. v. Kerr McGee Corp. (In re Tronox Inc.),* 503 B.R. 239 (Bankr. S.D.N.Y. 2013), for the principle that capital adequacy cannot be demonstrated "by a debtor's ability to cannibalize itself and sell off assets piece by piece, until nothing is left." *Tronox,* 503 B.R. at 321.  *See also ASARCO*, 396 B.R. at 398 (capital adequacy is not shown by a company's ability to halt certain operations and "cannibaliz[e] itself" for a year or two as it "limp[s]" towards bankruptcy).  These cases are clearly distinguishable.  In *ASARCO*, the debtor sold its "crown jewel," which generated almost all of its net income and cash flows, at a time when the company was insolvent, entrenched in asbestos litigation, had four consecutive years of audit reports raising "substantial doubt" about its ability to continue as a going concern, and had been threatened with involuntary bankruptcy.  *ASARCO*, 396 B.R. at 304, 306, 374, 386.  Not surprising, the court found that the sale was done with the intent to hinder or delay creditors, not to raise capital to sustain its operations.  *Id.* at 386-88, 397.  In *Tronox*, the debtor was left with crippling environmental, tort and pension liabilities after its predecessor entity spun off the company's more profitable oil and gas business.  *Tronox,* 503 B.R. at 252, 253 n.8, 321-23.  Combined with the fact that "Tronox's bankruptcy took place in connection with a global financial crisis and a sharp down-turn in the market for its principal product," the Court concluded that Tronox's "legacy liabilities, in the end, suffocated the flower," and therefore any hypothetical asset sales would have been "a losing game in the long run."  *Id.* at 321-23.

In contrast to *ASARCO* and *Tronox*, where the debtors were clearly doomed to fail, Adelphia had a large and valuable subscriber base, particularly in comparison with its capital

needs, and was operating in what both parties agree was a strong market for cable companies. *See* Defs.' Opp. at 24 (citing Flynn Rept. ¶ 45).  The argument that, by selling a relatively small portion of its subscriber assets, Adelphia would be "cannibalizing" itself to survive is not persuasive.

### 2.  Adelphia's High Leverage Ratio

Recovery Trust further challenges Judge Gerber's endorsement of FPL's position that Adelphia would have been able to access the capital markets even if it had exceeded the maximum leverage ratio permitted under its debt covenants, Tr. at 423:17-23, over Recovery Trust's view that, if Adelphia's actual leverage ratios were known at the time, "it is highly unlikely that Adelphia could have raised additional financing."  Flynn Decl. ¶ 4.

Both parties appear to agree that there was a robust appetite for investment in cable companies in 1999.  In his Declaration, Tabak showed that 1999 was a peak year for the cable industry, with deal volume and prices paid per subscriber reaching record levels.  Tabak Decl. ¶ 23.  *See also* Defs.' Opp. at 24.  Even Flynn conceded that "the financial markets had widespread enthusiasm for lending to the cable industry in 1999."  Flynn Decl. ¶ 23.  Although Flynn qualified her statement by noting that "markets were generally not comfortable with cable companies with leverage levels over 7.0–8.0x EBITDA," *id.*, that opinion is undercut by her prior testimony in another Adelphia litigation and by the evidence presented here.[6]

FPL showed that, after the stock repurchase transaction was consummated, Adelphia continued to access the credit markets in financing three new acquisitions in 1999, when its reported leverage ratio was 9.9x EBITDA, Tr. 41:12-44:5, and that other cable companies that

---

[6]      In a March 22, 2007 report on behalf of Adelphia in another litigation, Ms. Flynn opined that "[h]ighly leveraged cable companies were considered to have ready access to capital in early 2002, despite the fact that upgrade programs had not been completed and free cash flow was not imminent."  *See* Tr. 68:15-18, 78:14-20.  As shown in Tabak's Declaration, demand for cable was much more robust in 1999, when deal volume reached approximately $70 billion, than in 2002, when deal volume was only about $1.4 billion. Tabak Decl. ¶¶ 22-24.

were more leveraged also had access to credit.  Recovery Trust argues, however, that Adelphia's acquisitions should be disregarded because they were financed with secured debt collateralized by the assets of the newly purchased companies, rather than on Adelphia's own credit.  Pl.'s Obj. at 19.  While the Court agrees that these acquisitions do not necessarily demonstrate that lenders were entirely undeterred by Adelphia's high leverage ratio, the fact that Adelphia was able to acquire three apparently creditworthy companies shortly after the challenged transaction is nonetheless a sign of financial vitality that generally tends to undercut Recovery Trust's argument that Adelphia was foreseeably doomed to fail.

Recovery Trust's attempts to rebut evidence showing that other highly leveraged cable companies obtained access to credit during the relevant period are not persuasive.  Recovery Trust argues that Mediacom, which completed an IPO and issued new debt between 1999 and 2001 despite having leverage ratios during that period ranging from 11.1x to 17x EBITDA, Defs.' Post-Trial Mem. at 40–41, should be disregarded as a "single, anecdotal data point."  Pl.'s Obj. at 19-20.  While the Court agrees that Mediacom's ability to obtain financing from 1999-2001 under more highly leveraged conditions than Adelphia, by itself, is of modest probative value, that evidence does not stand alone.  Other evidence shows: (1) the strength of the market for cable investment in 1999; (2) that "the capital markets expected all of the major [multi-system operators] to make substantial capital expenditures during this time period to upgrade their cable plant," Flynn Decl. ¶ 19; (3) that other cable companies were able to raise funds despite having negative cash flows, Defs.' Opp. at 3, 15; and (4) that Adelphia was able to obtain financing to acquire three new companies in 1999.  The combined evidence substantially rebuts Recovery Trust's position.  Indeed, Shaked conceded that Adelphia would not necessarily have been prevented from accessing capital markets even if it had breached its debt covenants.  Tr. 423:17-23.  The Court therefore finds that Recovery Trust failed to meet its burden of showing

that Adelphia's high leverage ratios would have substantially limited its access to the capital markets.

### 3. Adelphia's Fraud

Finally, Recovery Trust challenges Judge Gerber's finding that it failed to meet its burden of showing that, in combination with other factors, the capital markets would have been closed to Adelphia if its fraud had been disclosed in 1999.  Decision at 60.

First, Recovery Trust contends that Judge Gerber erred in accepting FPL's expert's testimony regarding similar companies that successfully secured financing after disclosing fraud because "none of the five companies" was analogous to Adelphia.  Pl.'s Obj. at 20.  This argument is unpersuasive on several grounds.  First, Tabak's opinion was not limited to five companies; he cited empirical data showing that the majority of companies that issued restatements from 1997 through 2002 (237 of 437 companies for whom sufficient data was available), including nineteen companies that issued restatements due to fraud, were able to obtain post-restatement financing.  Defs.' Opp. at 13; Tabak Decl. ¶ 35-41.[7]  Recovery Trust has not disputed this data or objected to Tabak's conclusions as to its significance.

With respect to the five major comparator companies, Cendant, Waste Management, Rite-Aid, Enron and WorldCom, the Court finds that, even though none of these companies is wholly analogous to Adelphia, the size of the companies and the scale of the frauds at issue make them meaningful data points.  In particular, the Court finds it significant that each of these

---

[7]   The study cited by Tabak further indicated that the incidence of fraud was similar among the 237 companies that obtained both pre- and post-restatement financing, and the 200 companies that received only pre- or only post-restatement financing, and therefore, the fact that a company restated due to a fraud (as opposed to restating for any other reason) did not measurably reduce its likelihood of obtaining post-restatement financing. Tabak Decl. ¶ 38.  Put differently, if companies that restated for fraud had greater difficulty in obtaining post-restatement financing than companies that restated for any other reason, then the incidence of fraud would have been much lower among the group of companies that obtained both pre- and post-restatement financing.  Instead, the study showed that the incidence of fraud was similar between the two groups.  *Id.*

companies was able to obtain substantial amounts of financing, much larger than the $600

million required by Adelphia, after disclosing frauds that were substantially larger than

Adelphia's fraud in 1999.  *See* Tabak Decl. ¶¶ 45-63.  The fact that *all* of these companies were

able to obtain financing under such circumstances is persuasive evidence that cannot be ignored

simply because Cendant and Waste Management had lower leverage ratios than Adelphia, Rite-

Aid had a much higher leverage ratio but more liquid inventory, and Enron and WorldCom filed

for bankruptcy less than two years after obtaining financing.  Notably, Recovery Trust provided

no empirical evidence of other major companies who were *unable* to obtain financing following

disclosure of a fraud, effectively asking the Court to disregard Tabak's evidence on Recovery

Trust's say-so.

Second, Recovery Trust argues that Judge Gerber erred in failing to consider whether

Adelphia could have afforded to borrow funds after disclosing its fraud, based on the estimated

1% increase to its borrowing costs as a "fraud premium."  Pl.'s Obj. at 21-22.  The Court agrees

that the record is thin on this point.  *See* Tabak Decl. ¶¶ 35; Tr. 783:6-784:25, 890:2-17.  This

scarcity of evidence, however, only demonstrates that Recovery Trust, which appears to have

offered *no* evidence that an additional 1% in borrowing costs *would have been* the proverbial

"straw that broke the camel's back," failed to meet its burden of proof.  In light of Adelphia's

$2.5 billion equity cushion, the fact that its high leverage ratio was not necessarily an

impediment to financing, and the fact that it could have raised capital through asset sales, the

Court finds it improbable that a 1% increase in financing costs for $600 million would have

"pushed it down the road to ruin."  Pl.'s Obj. at 22 (citing *In re Crown Unlimited Mach., Inc.,*

No. 03-13400, 2006 WL 6401548, at *9 (Bankr. N.D. Ind. Oct. 13, 2006), *aff'd sub nom. Boyer*

*v. Crown Stock Distrib., Inc.,* No. 04-0185, 2009 WL 418275 (N.D. Ind. Feb. 17, 2009), *aff'd in*

*part, rev'd on other grounds*, 587 F.3d 787 (7th Cir. 2009)).

Recovery Trust also argues that FPL and Judge Gerber failed to calculate the amount of capital that Adelphia could have raised after disclosing its fraud, as was necessary to show that the capital raised would be adequate to meet Adelphia's $600 million capital expenditure requirements.  Pl.'s Obj. at 22.  Again, it was Recovery Trust's burden to prove that Adelphia *could not have* raised $600 million, not FPL's burden to prove that it could have, particularly given the evidence that five large companies raised significantly more than $600 million after engaging in larger frauds.

Finally, Recovery Trust challenges Judge Gerber's characterization of Adelphia's fraud as being "in its infancy" in 1999.  Pl.'s Obj. at 23.  This argument likewise has no merit.  The record shows that Judge Gerber was merely responding to Recovery Trust's expert, who argued that, because the markets closed to Adelphia when a $12.4 billion fraud was exposed in 2002, they would have closed to Adelphia if a $400 million fraud had been exposed in 1999.  Shaked Rept. ¶ 148 ("There is no reason to believe that at January 28, 1999, the situation would have been any different.").  Judge Gerber was correct in pointing out the fallacy in Shaked's suggestion that the result reached in 2002 would have been precipitated in 1999 despite very different underlying circumstances.  *See* Decision at 60 ("…Adelphia's fraud in 1999 was much less extensive than the fraud that had infected the company by 2002.  For that reason, I find Shaked's heavy reliance on the outcome of Adelphia's fraud disclosures in 2002 to be flawed.").  The Court agrees wholeheartedly with Judge Gerber's finding in this regard.  The Court further concurs with Judge Gerber's judgment that Coyle's unaccompanied and otherwise unsupported testimony that Adelphia would likely have slid into bankruptcy if the fraud had been exposed in 1999, Tr. 693:3-8, was not credible given the testimony of FPL's experts who demonstrated that, in most cases, disclosure of a financial fraud does not precipitate bankruptcy.  Tabak Decl. 34-63, 768:5-768:23.

## CONCLUSION

Based on the conclusions set forth above, the Decision is affirmed in all respects, and Recovery Trust's appeal of the Decision is hereby dismissed.  The Clerk of Court is respectfully requested to close the case.


**SO ORDERED.**


**Date:  March 13, 2015**
       **New York, NY**               **VALERIE CAPRONI**
                                       **United States District Judge**